Michael Edward Kennedy
35377-098
Salisbury, Maryland
33250 Old Ocean City Road
Parsonsburg, Maryland 21849

FILED

2008 JAN -7 PM 12: 51

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY_____DEPUTY

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

NUNC PRO TUNC

JAN -3 2008

| | |
|---|---|
| MICHAEL EDWARD KENNEDY, ) | Civil Case No. 07CV1996  JAH (RBB) |
| ) | |
| Petitioner,    ) | |
| v.                ) | **PETITIONER'S TRAVERSE TO** |
| ) | **THE GOVERNMENT'S RESPONSE** |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Respondent. ) | |
| _____ ) | |

I, Michael Edward Kennedy, declare that I am the petitioner in the above named proceeding and submit this traverse to the government's Opposition to Motion Under 28 U.S.C. §2241 response filed with this court on December 3rd, 2007.

I.    **The Issues Presented.**

The issues presented for decision by this court are, in sum, four-fold in nature. First, whether the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) violates the United States Constitution's Suspension Clause, Article I, Section 9, clause 2,  by acting to suspend and/or eliminate Mr. Kennedy's ability to file a writ of habeas corpus - or obtain review of his second or successive motion to vacate his sentence in the lower courts - pursuant to 28 U.S.C. §2255 or 28 U.S.C. §2241.  Secondly, whether the AEDPA violates the Constitution's Fifth Amendment Due Process Clause,  where such application acts to either

Civ-69 (Rev. 9/97)                                    ::ODMA\PCDOCS\WORDPERFECT\22832\1

- 1 -

suspend and/or eliminate judicial collateral review, by application of its narrowly limited circumstances as defined in paragraph 8 of 28 U.S.C. §2255, of Fourth, Fifth, and Sixth Amendment constitutional violation claims raised in a second or successive §2255 motion. Third, whether Mr. Kennedy has met the burden in showing that the provisions of 28 U.S.C. §2255, as amended by the AEDPA, render Section 2255 "inadequate and ineffective" in this case to test the legality of his detention and allow review of his claims pursuant to 28 U.S.C. §2241. And fourth, whether the facts in this case demonstrate and establish by clear and convincing evidence that, but for the constitutional errors, no reasonable juror would have found Mr. Kennedy guilty where such facts (a) raise sufficient doubt to unquestionably substantiate Mr. Kennedy's conviction was not the product of a fair trial as envisioned by the constitution, and; (b) sufficient doubt is raised by these new facts to Mr. Kennedy's guilt that serve not only undermine confidence in the results of the trial but also justify the conclusion that his concurrent life sentences would be a miscarriage of justice.

**II.    The AEDPA Acts To Violate The Suspension Clause And Due Process Clause Of The Fifth Amendment By Eliminating Judicial Collateral Review Of Fourth, Fifth, And Sixth Amendment Violation Claims Raised In A Second Or Successive §2255 Petition.**

As previously argued in Mr. Kennedy's initial §2241 petition and reargued by incorporation and reference here, the precise language of the "gate-keeping" provision of §2255 acts to eliminate judicial collateral review of Fourth, Fifth, and Sixth Amendment Constitutional violation claims arising in second or successive §2255 motions. This very fact alone either renders Section 2255 "inadequate and ineffective" to test the legality of Mr. Kennedy's detention and allow review of his claims pursuant to 28 U.S.C. §2241 -- or it eliminates judicial collateral review of Fourth, Fifth, and Sixth Amendment Constitutional violation claims arising in second or successive §2255 motions in violation of the Due Process Clause.

Indeed, interpreting AEDPA in a way that results in the denial of review to

claims based on some constitutional violations, but not to claims based on other constitutional abuses, violates the Due Process Clause of the Fifth Amendment to the Constitution. Such a noticeably unjust interpretation of AEDPA cannot be permitted to stand, particularly since it would allow the choice between life and death in some cases to turn on an arbitrary distinction that is almost surely the result of poor legislative drafting.

Nor is this argument without merit when the gate-keeping provisions for successive motions under the AEDPA specifically provides in paragraph 8 of 28 U.S.C. §2255 that a successive motion to vacate a conviction and sentence may be filed only under certain limited circumstances. Two such circumstances are when the newly-raised claim demonstrates:

(1) newly discovered evidence that, if proven and viewed in the light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable fact finder would have found the [petitioner] guilty of the offense; or

(2) a new constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unable.

28 U.S.C. §2255 ¶8.

Hence, in a very real factual scenario such as in the case at bar, the very language of the AEDPA's gate-keeping provisions eliminate all judicial collateral review of Fourth, Fifth, and Sixth Amendment Constitutional violations such as, in example, search and seizure claims, ineffective assistance of counsel claims, due process claims, or even double jeopardy claims which arise in a second or successive §2255 motion and do not relate directly to actual innocence. And because these claims do not satisfy the criteria required by paragraph 8 of 28 U.S.C. §2255, a petitioner will not and, indeed, will never get an opportunity to present their claims in a second or successive §2255 motion. To forestall any effective challenge, the government would only merely need to withhold the material evidence and facts supporting a claim until at least such a point as an initial §2255 motion had been decided and thereby eliminate any hope that these claims would ever see the light of judicial collateral review..

Similarly, the Court of Appeals for the Ninth Circuit only serves to support this argument when addressing the inadequate and ineffective issue in <u>Stephens</u> v. <u>Herrera</u>, 464 F.3d at 898, by finding that a §2241 petition is available under the 'escape hatch' of §2255 when a petitioner (1) does make a claim of actual innocence, and (2) has not had an 'unobstructed procedural shot' at presenting that claim. And here, once again, as these claims do not relate directly to actual innocence -- they will never see the light of day.

Without a doubt, no district nor circuit court to date has yet addressed the implications that the narrowly limited circumstances of paragraph 8 of 28 U.S.C. §2255 has upon judicial collateral review of Fourth, Fifth, and Sixth Amendment Constitutional violation claims arising in a second or successive §2255 motion. Indeed, either the amended provisions of §2255 violate the Due Process Clause by eliminating judicial collateral review of Fourth, Fifth, and Sixth Amendment Constitutional violation claims raised in second or successive petitions -- or acts to render §2255 inadequate and ineffective to test the legality of a detention.

A further issue posed by the above, is whether the standard articulated by the Supreme Court in <u>Bousley</u> v. <u>United States</u>, 523 U.S. 614 (1998), relative to actual innocence, is the appropriate standard when applied to a collateral review of Fourth, Fifth, and Sixth Amendment Constitutional violation claims arising in a second or successive petition where §2255 has been found to be inadequate or ineffective. Of course, what is of even further relevance here is that harm flowed from the prosecutions actions -- and thus -- the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged.

III.    **Mr. Kennedy's §2241 Petition Demonstrates He Has Made A Claim Of Actual Innocence And Never Had An Unobstructed Procedural Shot At Presenting These Claims.**

As discussed above, in dealing with the inadequate and ineffective issue, the Court of Appeals for the Ninth Circuit found in <u>Stephens</u> v. <u>Herrera</u>, 464 F.3d at 898, that a §2241 petition is available under the 'escape hatch' of §2255 when

a petitioner (1) does make a claim of actual innocence, and (2) has not had an 'unobstructed procedural shot' at presenting that claim. The petition now before the Court demonstrates that Mr. Kennedy has, in fact, made a claim of actual innocence and never has had an unobstructed procedural shot at presenting those claims.

### A.   Mr. Kennedy Has Made A Claim Of Actual Innocence In His §2241 Petition.

In defining the actual innocence requirement for purposes of the escape hatch of §2255, the Court of Appeals for the Ninth Circuit found the standard articulated by the Supreme Court's holding in Bousley v. United States, 523 U.S. 614 (1998), to be the proper test in that "To establish actual innocence, petitioner must demonstrate that, in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him." Id. at 623 (internal quotation marks omitted). The showing of "actual innocence," moreover, extends not only to the elements of the crime, but also to the existence of aggravating factors and to mitigating evidence that bore on whether there is a "fair probability" that the admission of false evidence, or preclusion of true mitigating evidence, caused by constitutional error, resulted in a verdict that was not the product of a fair trial.

Moreover, when making this determination, the proper standard of materiality requires the suppressed evidence not only be assessed absent the items gained from Mr. Kennedy's residence in what was otherwise an illegal search and seizure under settled law -- but also in light of the suppressed information if known at the time of his first trial, not in hindsight. It is additionally important for the Court to remember and note that the herein case in which the guilty verdict ensued was Mr. Kennedy's third trial -- the first two trials having resulted in hung juries. This point only serves to underscore the prior existence of a reasonable probability of doubt to not only Mr. Kennedy's guilt -- but to an even greater probability that -- were it not for the prosecution's submission of items obtained in an illegal search and seizure and suppression of material facts and evidence -- it is more likely than not that no reasonable juror would have

convicted Mr. Kennedy at his first trial. And in this last point Mr. Kennedy notes what he hopes would otherwise be obvious: that is at the very latest point of time <u>when</u> the prosecution should have disclosed the otherwise suppressed material facts and evidence -- not three trials and entire appellate process later.

Without question, unlike the movies of old, there is no "smoking gun" or repentant killer to step forth years later to confess from a guilt ridden conscious. In reality, as there were no witnesses to the crime -- the sole evidence against Mr. Kennedy was the handling and interpretation of the physical evidence and testimony of the Federal Bureau of Investigation Special Agents involved.

The victim's time of death, was, as the Court of Appeals acknowledged in both its opinions, "a pivotal issue in the case.[1]" The following timetable will make clear how pivotal an issue it was.

Mr. Kennedy was scheduled to work the midnight to 8:00 AM shift on the morning in question -- which was midnight, Saturday, November 24th to 8:00 AM, Sunday, November 25th. Mr. Kennedy began work as usual and, at some point later, encountered Maria Lopez De Felix.

Mr. Kennedy last saw Maria, by his account, at approximately 2:00 AM on Sunday morning. Later, at approximately 5:30 AM, Mr. Kennedy left the border to seek hospital treatment for his injured finger. Although he returned briefly to the office at approximately 11:00 AM to sign some papers that Sunday, it is uncontroverted that his last opportunity to visit the murder scene was around 5:30 AM on Sunday, November 25th, 1979. Maria's body was discovered on Monday, November 26th at approximately 10:00 AM -- about twenty-nine (29) hours after Mr. Kennedy had left the area.

The Court of Appeals also stated that "this [was] a close case[2]," and that "no single evidentiary item [standing alone] would support the jury's verdict[3]."

---

[1] See <u>United States</u> v. <u>Kennedy</u>, 714 F.2d, at 972 (1983).
[2] See <u>United States</u> v. <u>Kennedy</u>, 714 F.2d, at 971 (9th Cir. 1983); and <u>United States</u> v. <u>Kennedy</u>, 890 F.2d 1056 (9th Cir. 1989).
[3] See <u>United States</u> v. <u>Kennedy</u>, 714 F.2d, at 973 (9th Cir. 1983);

This suggests that there was no single area of evidence that was crucial to the verdict, and, from the prosecution's standpoint, this is correct. It should also be noted that this opinion was, of course, rendered without deliberation of the items submitted at trial that were in fact inadmissible as evidence under settled law.

From the standpoint of Mr. Kennedy and his defense counsel, however, there was a crucial evidentiary issue: evidence concerning the time of death. In acknowledging this, the Court of Appeals stated that "If death occurred, as the Government expert argued, within the 24 to 36 hours before the body was discovered, it points towards Appellant's guilt. If death occurred, as the expert for Appellant's insisted, within 12 to 24 hours of the body's being found, it points towards innocence as Appellant was not on duty at the time.[4]"

With all respect, Mr. Kennedy submits that this misstates the case. First, death 24 to 36 hours prior to discovery of the body cannot in itself "point towards [Mr. Kennedy's] guilt." The most that can said, on this score, is that such a time of death is consistent with guilt. Indeed, because Mr. Kennedy left the scene about 29 hours before the body was found, the most that should be said is that such a time of death is not inconsistent -- or, better yet, not wholly, inconsistent -- with guilt. But this is not too important.

What is important, though, is that a time of death 12 to 24 hours before the body was found -- indeed, any time of death fewer than about 29 hours before the body was found -- does more than simply "point toward innocence." It proves innocence.

To say that the victim died at a time when Mr. Kennedy could have been there is to say no more than he could have killed her. But to say that the victim died at a time when Mr. Kennedy could not have been there is to say no less than he could not have killed her.

---

[4] See United States v. Kennedy, 714 F.2d, at 972 (9th Cir. 1983)and United States v. Kennedy, 890 F.2d 1056 (9th Cir. 1989).

Obviously, then, time-of-death evidence was much more important to the defense then it was to the prosecution.  And while medical evidence which can establish that a defendant could be guilty is <u>useful</u> to the government, medical evidence which establishes that a defendant could not be guilty is <u>crucial</u> to the defense.

All this is not to cast blame upon the trial court or Court of Appeals.  That the crucial distinction between the importance of time-of-death evidence to the prosecution and to the defense was not drawn is understandable in light of the fact that the issue of nondisclosure was not before the Court.

Of course, that in itself is the point.  Here, once again, it is clear that time-of-death evidence <u>can</u> prove innocence, and to a defendant it can -- and to Mr. Kennedy it did -- take on crucial dimensions.

Truly to understand the denial of due process and Mr. Kennedy's right to a fair trial requires analysis of the record as a whole.  The prosecutor's withholding of material evidence, as well as his deliberate deception of the trial court and Mr. Kennedy's defense counsel, must be viewed in light of the effect it had upon Mr. Kennedy not having received a fair trial as envisioned by the Constitution -- but also on preventing the jury, as the trier of fact, from being given an opportunity to see the suppressed photographs and material in order to form their own opinion.

One of the difficulties with the <u>Brady</u> rule is that it is not self-implementing.  In cases which involve its application, the exculpatory evidence has come to light through further investigation or the belated generosity of the prosecution... for the rule to be fully effective the defendant would have to be clairvoyant; if not, how would he know of the suppressed evidence.

In the case at bar, it is impossible to characterize the prosecutor's actions and nondisclosure as anything other than deliberate when viewed in light of his submission of what he knew was otherwise inadmissible evidence.  And here, as usual, intent is difficult -- if not impossible -- to prove directly; but the records and documents speak volumes to support Mr. Kennedy's claim of actual innocence.

The easy cases -- at least they seem so now -- are where the prosecutor's

suppression is "deliberate" by which we include not merely a considered decision to suppress, taken for the very purpose of obstructing, but also a failure to disclose evidence whose high value to the defense could not have escaped the prosecutor's attention as in the case a bar.  Such cases rarely present a problem as to "the degree of prejudice which must be shown"; almost by definition the evidence is highly material.

Among the items suppressed by the prosecution was a page excerpt from the investigative notebook of Special Agent Vardell, attached to this Traverse as Exhibit 1 and incorporated by reference in this point, reflecting the written entry "Suspect could be an 'O' secretor."  This entry was highly relevant given it would have led trial counsel to not only to learn of a blood-soaked piece of toilet paper being found where the alleged murder-rape occurred -- but would have obviously shown the presence of another individual not Mr. Kennedy.  Trial counsel would have been then been able to further corroborate this by the released San Diego Police Preliminary Examination on Blood and Semen report, attached to this Traverse as Exhibit 2 and incorporated by reference in this point, which reveals that "Group 'O' human blood was identified on specimen Q47."  Again, this would indicate someone other than Mr. Kennedy who is type "A Positive."

A secondary issue raised by this suppressed material is that it obviously would have allowed Mr. Kennedy's trial counsel to provide the jury with additional information that the test for secretor/non-secretor was not the so strong piece of evidence the prosecutor implied.  It is unquestionable that, had this information not been suppressed, defense counsel would have elicited from the lab experts the fact that the victim had neither bathed nor changed her panties in well over a twenty-four (24) hour and that would have resulted in a natural bacteria buildup.

This bacteria buildup, coupled with the bacteria from urination at the time of death, has the ability to destroy the proteins, etc., which identify a secretor.  Thus, a more complete questioning would have resulted in testimony that the murderer and/or rapist could as easily have been a secretor as a non-secretor.  But for the suppression, the jury was never allowed to hear this in order to form

their own opinions as the triers of fact -- and this fact must be construed as having an effect upon the outcome of the trial .

Perhaps two of the most important and significant documents released pertained to the time-of-death issue. The first, attached to this Traverse as Exhibit 3 and incorporated by reference in this point, is the November 26th, 1979, Federal Bureau of Investigation Memorandum which specifically states that "The female victim had been dead approximately eight to nine hours..." The second document, attached to this Traverse as Exhibit 4 and incorporated by reference in this point, is the December 6th, 1979, Federal Bureau of Investigation "Airtel" memorandum that specifically states "Crime scene investigation and preliminary investigation by the San Diego, California, Police Department Laboratory and San Diego County Morgue indicates victim was sexually assaulted and strangled to death sometime during the night of 11/25-26/79."

There are two critical points raised by these documents: (1) trial counsel would have established that these time factors were based on something -- not just numbers and dates randomly picked out of the air; and (2) the prosecutor's reason for suppressing these documents was for one simple reason -- because they were inconsistent with the prosecutions theory on time-of-death and <u>wholly consistent</u> with the defense theory on time-of-death. Without a shadow of doubt, the prosecution could not afford releasing information which placed time-of-death during a period when it is uncontroverted that Mr. Kennedy simply was not there.

As with government's release of the unexecuted search warrant, another crucial disclosure were several close-up crime scene photographs taken of the victim's face, one photograph of which is attached to this Traverse as Exhibit 5 and incorporated by reference in this point, which have never been previously released to Mr. Kennedy's defense counsel at any of his three trials nor during the entire appellate process. From a forensic standpoint, these photographs were extremely significant to Mr. Kennedy's defense counsel because there are <u>no deposits of fly larvae in the victim's eyelids</u> -- and this very fact only lends to add further weight to Mr. Kennedy's actual innocence given the pivotal issue of

time-of-death in this case.

Mr. Kennedy contends here that -- had this material not been withheld by the government -- the defense expert, Dr. Thomas Noguchi, the Chief Medical Examiner for Los Angeles County, would have provided expert testimony that <u>fly larvae is deposited in the eyelids within four to six hours following death</u> -- which is consistent with the defense theory on time-of-death. Moreover, Mr. Kennedy's defense counsel would have also provided the jury with expert testimony from an entomologist as a added corollary to Dr. Noguchi's testimony. However, the jury was not given a opportunity to see the photographs nor hear the testimony of Dr. Noguchi relative to this in order to form their own opinion and, that too, must also be deemed to having had an effect upon the outcome of Mr. Kennedy's trial.

That the foregoing records and documents speak volumes to support Mr. Kennedy's claim of actual innocence they were, without a doubt, crucial to the issue of time of death in this case. This fact alone is underscored by the sworn affidavits of Juanita R. Brooks and Alex Landon, attached to this Traverse as Exhibit 6 and incorporated by reference in this point. It should be noted at this point, however, that any reference made to Dr. John Burton's opinions in these affidavits should not be considered as they are hearsay relative to this inquiry.

What is important regarding these affidavits are three things. First, each affidavit clearly demonstrates that the prosecution's withholding of material facts and evidence was not a single isolated incident in this case. Secondly, that all of evidence and material facts would have greatly assisted defense counsel's case regarding the crucial issue of time of death. And, lastly, underscore and support Mr. Kennedy's claim of actual innocence relative to the statements of Dr. Luibel, the examining pathologist in this case.

Specifically, Dr. Luibel informed Juanita R. Brooks that, when he viewed the body at 8:30 AM on Tuesday, November 27th, 1979, it was his opinion that the death had occurred twenty-four (24) to thirty-six (36 hours before that time. That opinion would still place the time of death between fifteen (15) and twenty-seven (27) hours after Mr. Kennedy had left the area. Dr. Luibel did, of course,

later testify at all three trials consistent with this opinion.

Lastly, and submitted as a final thought of consideration to Mr. Kennedy's actual innocence, is the June 11th, 1980, testimony of the government's hair identification expert at the first trial, Frederick J. Wallace, a Special Agent of the Federal Bureau of Investigation.  With respect to the head hairs, Special Agent Wallace indicated at Mr. Kennedy's first trial that the sample consisted of:

> "***grey, light brown and brown head hairs,
> also exhibiting caucasian characteristics
> that were dissimilar to the known samples
> that were reported to me to be from the
> victim, and also dissimilar to the known head
> hair samples that were reported to me to be
> from the Defendant, Mr. Kennedy."

The prosecutor, of course, found another hair identification expert to give the testimony needed at the third trial.  The jury was never given an opportunity to hear the testimony or see the report of Special Agent Wallace which rebutted this testimony at the third trial as Special Agent Wallace was "unavailable" due to health reasons.  Certainly this evidence, if it would have not convinced the jury not to rely on the hair identification evidence, would have, at the very least, cast heavy doubt upon the testimony of the government's expert witness in this third trial.  And here, once again, this is a case where the guilty verdict ensued out of a third trial after the first two trials ended in hung juries.

### B.     Mr. Kennedy Has Never Had An Unobstructed Procedural Shot At Presenting These Claims .

Mr. Kennedy satisfies the requirement of not having had an "unobstructed procedural shot" at presenting his claim.  The records and documents supporting his  Brady, Bumper, Kyles and Strickland claims were not made available to him until after his first §2255 motion had been decided.   Moreover, while he met the one-year limitation period imposed by the amended provisions of the AEDPA on §2255 for filing his second or successive §2255 motion, that was denied based on the retroactive application of the AEDPA to his case.  Secondly, the AEDPA

amended the provisions of §2255 to eliminate any form of appeal or review of a circuit court's denial to issue a certificate of appealability. Third, as discussed in Supra II above, the precise language of the "gate-keeping" provision of §2255 acts to eliminate judicial collateral review of Fourth, Fifth, and Sixth Amendment Constitutional violation claims arising in second or successive §2255 motions in violation of the Due Process Clause of the Fifth Amendment to the Constitution. Fourthly, while Mr. Kennedy did attempt to raise these claims and challenge the constitutionality of the AEDPA in the districts of his confinement under a §2241 petition -- those districts dismissed his §2241 petitions for lack of jurisdiction. Given the dichotomy of circumstances, it cannot be found that Mr. Kennedy has ever had an unobstructed procedural shot at presenting these claims and facts supporting them for judicial collateral review.

## IV. The Government's Deliberate Deception Of The Trial Court And Mr. Kennedy's Defense Counsel Warrants Vacating The Conviction And Granting Him A New Trial.

Counsel for the government seeks this Court to turn a blind eye and, in essence, become a co-conspirator to the obstruction of justice and deliberate deception of the trial court in this matter. Nor is Mr. Kennedy's contention here not without merit. Indeed, it is beyond dispute that the prosecutor, Thomas M. Coffin, as well as FBI Special Agents Jerry L. Barnett, Kenneth A. Vardell, and James M. Bird, each had a legal and affirmative duty to notify the trial court that the items seized from Mr. Kennedy's residence were obtained as a result of an illegal search and seizure -- and thus inadmissible as evidence at trial.

Indeed, harm here flowed from context -- and context was created in large measure by the prosecutor. Failure to disclose the illegality of the search of Mr. Kennedy's residence to the trial court and defense counsel was bad enough. Without a doubt, it hardly could have been made worse -- but the prosecutor did find a way; by withholding the unexecuted search warrant, accompanying search warrant affidavit, and FBI logs pertaining to the search warrant of Mr. Kennedy's residence from both the trial court and his defense counsel. That the prosecutor

Civ-69 (Rev. 9/97)                                                          ::ODMA\PCDOCS\WORDPERFECT\22832\1

breeched this duty during the course of three separate trials and entire appellate process only serves to undisputedly underscore his actions were geared as to deliberately obstruct the due administration of justice in this case. More than that cannot be said, more than that need not be said when the material facts and evidence supporting this contention speaks for itself.

### A.    Mr. Kennedy's <u>Bumper</u> Claim Is Satisfied By the Facts and Evidence Now Before the Court.

The issue presented to the Supreme Court in <u>Bumper</u> v. <u>North Carolina</u>, 391 U.S. 543 (1968), was whether a search could be justified as lawful on the basis of consent when that "consent" has been given only after the official conducting the search had asserted to possessing a search warrant. The Court held that: (1) there could be no consent under such circumstances, and; (2) that the result can be no different when it turns out that the State does not even attempt to rely upon the validity of the warrant or fails to show that there was, in fact, any warrant at all.

The Supreme Court also held that any idea that a search can be justified by what it turns up was long ago rejected in our constitutional jurisprudence. It further found that a search prosecuted in violation of the Constitution is not made lawful by what it brings to light. It was also the Supreme Court's judgment then, that when a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that consent was, in fact, freely and voluntarily given and this burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority.

There was a search warrant in this case, and it remains possible that this warrant was issued under circumstances meeting all the requirements of the federal constitution. However, the Supreme Court found the end result is no different where the government did not even attempt to rely upon the validity of the warrant as in Mr. Kennedy's case - the lawfulness of the search still cannot be justified. Moreover, as noted by the three trial transcripts in each of Mr. Kennedy's cases, the prosecution explicitly and repeatedly renounced any type

of reliance on a search warrant for his residence.

But like all other parties to lawsuits, a prosecutor has an obligation to the courts and to other parties to present its claims at the earliest appropriate time, and to create an adequate record. And yet, there was a search warrant as previously indicated, and the prosecutor withheld it from Mr. Kennedy's defense counsel throughout three trials and entire appellate process -- because the officials conducting the search failed to execute -- thus rendering the search of Mr. Kennedy's home invalid and all items seized therefore inadmissible -- and this holds especially true when coupled with what was otherwise an unlawful and involuntary consent coerced out of both Mr. Kennedy, and Michael and Marilyn Kennedy, as co-owners of the residence .

Without a doubt, the facts now before this Court overwhelmingly establish that at approximately 11:30 AM on December 3rd, 1979, Jerry L. Barnett and James M. Bird, both Special Agents of the Federal Bureau of Investigation, transported Mr. Kennedy to the Federal Bureau of Investigation's San Diego field offices located downtown in the federal office building at 880 Front Street, San Diego, California. Mr. Kennedy was then subjected to a five-hour interrogation by Special Agent Bird and Kenneth A. Vardell, a second Special Agent of the Federal Bureau of Investigation.

Special Agent Vardell provided Mr. Kennedy with an "Interrogation: Advice of Rights" form at the onset of the interrogation, attached to this Traverse as Exhibit 7 and incorporated by reference in this point, which Mr. Kennedy declined to sign or waive his rights until contacting an attorney.

On this same date, December 3rd, 1979, Jerry L. Barnett, a Special Agent of the Federal Bureau of Investigation, submitted a sworn affidavit, attached to this Traverse as Exhibit 8 and incorporated by reference in this point, to United States Magistrate Judge Edward Infante, which attested to the probable cause to obtain a search warrant for Mr. Kennedy's residence. Magistrate Judge Edward Infante issued a search warrant for Mr. Kennedy's residence, attached to this Traverse as Exhibit 9 and incorporated by reference in this point, to Special

Agent Barnett at 4:32 PM on December 3rd, 1979.  The search warrant gave Special Agent Barnett ten (10) days to execute and return the warrant with a complete inventory of the property seized.

Although he was never actually shown a search warrant by either Special Agents Vardell or Barnett, at approximately 4:55 P.M. on December 3rd, 1979, Mr. Kennedy was informed by Vardell and Barnett that they were in possession of a search warrant for Mr. Kennedy's residence and requested his consent to the search of his residence.  Mr. Kennedy gave his consent to the search of his residence and locker under the belief that he had no legal right to object or resist the search in the face of Special Agents Vardell's and Barnett's assertion to possessing a search warrant for the residence.

After a search of his locker was completed, Mr. Kennedy was then taken back to his residence by Special Agents Vardell and Bird while Special Agent Barnett followed in a second vehicle.  Upon arrival at Mr. Kennedy's residence on that same evening, December 3rd, 1979, Special Agents Vardell and Barnett asserted to Mr. Kennedy's parents, Michael and Marilyn Kennedy, that they were in possession of a search warrant for their residence.

Special Agents Vardell and Barnett next asserted to Michael and Marilyn Kennedy that their son, Mr. Kennedy, had given his consent to the search of the residence.  Special Agents Vardell and Barnett then requested Michael and Marilyn Kennedy's consent to the search of their residence.  Although neither Michael nor Marilyn Kennedy were actually ever shown a search warrant by either Special Agents Vardell or Barnett, they gave their consent to the search under the belief that they had no legal right to object or resist the search after Special Agents Vardell and Barnett claimed to possess a search warrant for the home.

A search was thereafter conducted of Mr. Kennedy's residence on the evening of December 3rd, 1979, by Special Agents Vardell, Bird, and Barnett.  Among the items seized by Vardell, Bird, and Barnett during the course of the search of Mr. Kennedy's residence were uniform jacket; uniform pants; uniform

Civ-69 (Rev. 9/97)                                                    ::ODMA\PCDOCS\WORDPERFECT\22832\1

shirts; shoes; knife; and a roll of masking tape.  Each of preceding items were later used against Mr. Kennedy and submitted into evidence by the Assistant United States Attorney (AUSA) Thomas M. Coffin, at each of Mr. Kennedy's three trials.

It should be noted at this point, that AUSA Coffin repeatedly and explicitly denied to the court during the course of each of Mr. Kennedy's three trials to any existence of, or reliance upon, a search warrant to justify the search of the home. Rather, AUSA Coffin stated at each of Mr. Kennedy's three trials that the search was conducted based on the consent of Mr. Kennedy and Michael and Marilyn Kennedy, as co-owners of the residence.

What is of even greater importance here, is that Special Agent Jerry L. Barnett failed to execute the search warrant for Mr. Kennedy's home, attached to this Traverse as Exhibit 9 and incorporated by reference in this point, issued by Magistrate Judge Infante.  Special Agent Barnett did , nonetheless, completed and signed a  Federal Bureau of Investigation Form FD-340, attached to this Traverse as Exhibit 10 and incorporated by reference in this point, which does specifically state that the "search warrant for residence of Michael Kennedy not executed" and was "returned on 12/12/79."  A Federal Bureau of Investigation Form FD-340a, attached to this Traverse as Exhibit11 and also incorporated by reference in this point, similarly reflects the entry "search warrant for residence of Michael Kennedy not executed returned on 12/12/79."

It is also beyond dispute that Marilyn and Michael Kennedy granted their consent to the search of the residence only after the announcement by Special Agents Vardell and Barnett that they were in possession of a search warrant.  In her sworn affidavit of June 25th, 1997, attached to this Traverse as Exhibit 12 and incorporated by reference in this point, Marilyn Kennedy specifically states that she "believed that I had no legal right to object or resist the search and gave my consent based on Special Agent Vardell's and Barnett's claim that they possessed a search warrant for my home."  Similarly, Michael Kennedy also swore in his affidavit of June 25th, 1997, attached to this Traverse as Exhibit 13

Civ-69 (Rev. 9/97)                                                    ::ODMA\PCDOCS\WORDPERFECT\22832\1
- 17 -

and incorporated by reference in this point, that he too "believed that I had no legal right to object or resist the search and gave my consent based on Special Agent Vardell's and Barnett's claim that they possessed a search warrant for my home." And lastly, is the June 19th, 1997 sworn affidavit of Mr. Kennedy himself, attached to this Traverse as Exhibit 14 and incorporated by reference in this point, which attests his consent to the search of the residence on December 3rd, 1979, was given only under the belief that he had no legal right to object or resist the search and gave his consent based on the claim by Special Agents Barnett's and Vardell's that they possessed a search warrant for his home.

Moreover, a review of pages 693-694 of Mr. Kennedy's first trial transcript, attached to this Traverse as Exhibit 15 and incorporated by reference in this point, conclusively establish that on June 10th, 1980, Special Agent Barnett testified [ Page 693, Lines 21-23] he had Mr. Kennedy's consent to the search of his residence as well as Michael and Marilyn Kennedy's consent to the search of their residence [Page 693, Lines 24-25; Page 694, Line 1]. Likewise, the testimony of Special Agent Vardell on December 2nd, 1980, in Mr. Kennedy's third trial transcript, attached to this Traverse as Exhibit 16 and incorporated by reference in this point, also reflects that he had Mr. Kennedy's consent on December 3rd, 1979, to the search of his residence [Page 987, Lines 22-25].

And, as a final corollary to the foregoing, are two page excerpts from the investigative notebook of Special Agent Vardell, attached to this Traverse as Exhibit 17 and incorporated by reference in this point, reflecting the written entries confirming a consent search of Mr. Kennedy's residence on December 3rd, 1979. Accompanying this is the December 16th, 1980, letter written by the United States Attorney James Lorenz to Federal Bureau of Investigations Director William H. Webster, attached to this Traverse as Exhibit 18 and incorporated by reference in this point, which specifically states [Paragraph 3, lines 6-7] that the evidence gathered from Mr. Kennedy's home was pursuant to a warrant.

There can be little doubt, in light of the evidence before the court, that

Civ-69 (Rev. 9/97)

::ODMA\PCDOCS\WORDPERFECT\22832\1

- 18 -

when faced with the potential loss of evidence from Mr. Kennedy's residence, AUSA Coffin choose to withhold this information from the trial court and defense counsel and submit at each of Mr. Kennedy's three trials the items he recognized would otherwise be deemed as inadmissible evidence if allowed challenged.   As a final note, the Court should also remember and note that the search of Mr. Kennedy's residence came after a five-hour long interrogation during which time Mr. Kennedy declined to waive his rights until afforded counsel (Exhibit 7).  See also <u>United States</u> v. <u>Calhoun</u>, 542 F.2d 1094 (9th Cir. 1976).

**V.    Mr. Kennedy Does Not Require Permission To File A Writ Of Habeas Corpus Pursuant To 28 U.S.C. §2241.**

Counsel for the government first postures that Mr. Kennedy did not obtain nor receive permission to file the instant petition now before the Court.  As basis for this argument, counsel for the government professes to act as a spokesman for Judge  Burns that it was his intent to suspend the writ of habeas corpus in Mr. Kennedy's case to all criminal matters filed under either 28 U.S.C. §2255 or 28 U.S.C. §2241 and to equally deny collateral review to any Fourth, Fifth, or Sixth Amendment Constitutional claims.  This is simply not so.

Indeed, there is nothing on the record before this Court indicating that Judge Burns intended his order to be construed as anything but applying to a renewed §2255 petition filed by Mr. Kennedy absent a certificate of appealability issued by the Court of Appeals for the Ninth Circuit.  Nor is there anything before the Court from Judge Burns granting counsel for the government  permission to act as either Judge Burns' spokesman nor much less speak of his intent in that matter.  The government  is arrogant at best on this score.

Secondly, counsel for the government then argues that the provisions of §2255, as amended by the AEDPA, requiring a certificate of appealability, also apply to petitions filed pursuant to 28 U.S.C. §2241.  But here, once again, there is nothing in the legislative history of the AEDPA to even remotely suggest that

Civ-69 (Rev. 9/97)                                        ::ODMA\PCDOCS\WORDPERFECT\22832\I

- 18 -

Congress sought or even intended to extended the amended provisions of 28 U.S.C. §2255 to 28 U.S.C. §2241.

Third, counsel for the government maintains the instant §2241 petition should be dismissed because Mr. Kennedy's former §2255 motion is pending in the court of appeals. Again, this is incorrect. As Mr. Kennedy is challenging the constitutionality of the AEDPA as it pertains to the amended provisions of §2255, he withdrew that appeal given that 28 U.S.C. §2241 -- and not 28 U.S.C. §2255 -- was the proper forum to raise such a challenge.

VI.    This Court Has Jurisdiction Over Mr. Kennedy's §2241 Petition.

As this Court is well aware, the primary historic use of the writ of habeas corpus has been to test the legality of a prisoner's current detention. The basic purpose of a habeas proceeding therefore was to make certain a petitioner was not unjustly imprisoned and, if for some justifiable reason he was previously unable to assert his rights or was unaware of the significance of relevant facts, it was neither necessary nor reasonable to deny him all opportunity of obtaining judicial relief.

In this context the fundamental principal of a petition for writ of habeas corpus is clear: that government must always be accountable to the judiciary for a man's imprisonment and that the restraints on liberty must be removed if the imprisonment does not conform to the basic requirements of law. This points holds particularly true where the facts relied on are dehors the record and their effect on the conviction is not open to consideration and review on appeal -- use of the writ of habeas corpus in federal courts to test the constitutional validity of a conviction extends to cases where the writ of habeas corpus is the only effective means of preserving such rights.

It is also clear from the standpoint of availability of habeas corpus relief, that a petitioner is unlawfully subjected to physical restraint where he was denied constitutional rights at trial. This doctrine been expanded to include trial errors or irregularities which are so prejudicial to an accused's right to a fair and impartial

trial as to be clearly a deprivation of due process to constitute a justifiable federal issue which may be adjudicated in habeas corpus proceedings.

The Supreme Court's decision in United States v. Olano, 507 U.S. 725, at 736 (1993), further underscores these points by its decision that a district court should exercise its discretion in such cases were it would otherwise result in a miscarriage of justice. This Court, on examination of the factual circumstances now before it, shall find a miscarriage of justice does exist in the case at bar.

Furthermore, this compels Mr. Kennedy to note what would otherwise be obvious: that the Court of Appeals for the Ninth Circuit, by virtue of its decision in Stephens v. Herrera, 464 F.3d 895 (9th Cir. 2006), permits this Court jurisdiction over a §2241 petition under the "escape hatch" of §2255. Indeed, the remedy created by 28 U.S.C. 28 U.S.C. §2255 ¶ 5, is a substitute for habeas corpus for federal prisoners; section 2241 acts to back it up. Indeed, if it was the Court of Appeals intent to bar a District Court the jurisdictional authority of review when a §2241 petition is substituted where a motion by §2255 is deemed inadequate or ineffective to test the legality of a petitioner's detention -- it would have stated so in its decision.

In addition, to accept the government's contention here would have the effect of producing absurd results and creating a procedural quagmire to which there is no end. Nor is this contention without merit when a petitioner, seeking to proceed under §2241 by application of the savings clause as provided by §2255, would first be required to obtain a decision from the sentencing court as to the applicability of the savings clause to that particular case. If the sentencing court did then find §2255 to be inadequate and ineffective, it would next be required to issue an order to the court of confinement giving it leave to entertain the §2255 motion as a §2241 petition. However, given the differing standards applied from circuit to circuit, the court of confinement is only bound by the decisions of that circuit and not those of the sentencing court or its respective circuit if there exist a conflict to the applicable standards. In sum, the petitioner would end up where

they originally started in the beginning -- with no judicial collateral review of the constitutional violation claims raised.

### A.    Mr. Kennedy's §2241 Petition Satisfies the "Inadequate and Ineffective" Criteria Pursuant to the Savings Clause of Section 2255.

In amending the provisions of 28 U.S.C. §2255 , Congress provided, in relevant part, that the "savings clause" of section 2255 allows :

> An application for a writ of habeas corpus in behalf of a prisoner who is authorized to apply for relief by motion pursuant to this section, shall not be entertained if it appears that the applicant has failed to apply for relief, by motion, to the court which sentenced him, or that such court has denied him relief, <u>unless it also appears that the remedy by motion is inadequate or ineffective to test the legality of his detention</u>.

Section 2255 is rendered inadequate and ineffective by the very language of the gate-keeping provisions of the AEDPA for successive motions. As previously argued in Supra II above, paragraph 8 of 28 U.S.C. §2255 specifically provides that a successive motion to vacate a conviction and sentence may be filed only under certain limited circumstances. Two such circumstances are when the newly-raised claim demonstrates:

> (1)    newly discovered evidence that, if proven and viewed in the light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable fact finder would have found the [petitioner] guilty of the offense; or
>
> 2)    a new constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unable.

28 U.S.C. §2255 ¶8.

However, the effect of this amended provision is to violate the Due Process Clause of the Fifth Amendment by acting to suspend and/or eliminate judicial collateral relief of all Fourth, Fifth, and Sixth Amendment constitutional claims raised in a second or successive §2255 motion and which do not relate

directly to a claim of actual innocence.  Thus, it abolishes the procedural avenue and means by which a federal prisoner may test the legality of his detention where it is based on a Fourth, Fifth, or Sixth Amendment constitutional claim. Taken to its most extreme, this would seem to co notate that  Fourth, Fifth, or Sixth Amendment constitutional rights would not exist after a petitioner had filed their first initial  §2255 motion.

Although Mr. Kennedy has raised a claim of actual innocence and not had an unobstructed procedural shot at presenting his claims for collateral review, it is undisputed that a motion under §2255 has proven inadequate and ineffective to test the legality of his detention in this case where the amended provisions of §2255 have acted to abolish the procedural avenue in which to pursue these claims and to suspend and/or eliminate collateral relief of all Fourth, Fifth, and Sixth Amendment constitutional claims raised in a second or successive §2255.

**VII.    Mr. Kennedy's  §2241 Petition Should Not Be Transferred To The United States District Court For The District Of Maryland.**

Counsel for the government is aware that the Honorable Benson Everett Legg, Chief Judge for the United States District Court for the District of Maryland, dismissed Mr. Kennedy's §2241 petition [CV No. L-07-2964] without prejudice by holding that "Kennedy's claim, if successful, would require this court to entertain challenges to the validity of his criminal convictions.  Inasmuch as Kennedy was convicted in the Southern District of California, this Court has no jurisdiction over such challenges."

Thus by effect, transferring Mr. Kennedy's  §2241 petition to the District of Maryland would leave him in the position with no procedural path down which to bring a claim and obtain substantive review of his claims -- as well as serve to create another, separate constitutional violation by suspending the writ of habeas corpus and violate the Due Process Clause of the Fifth Amendment.

And here, once again, transferring Mr. Kennedy's §2241 petition to the District of Maryland poses the same type of procedural quagmire as discussed

above in Supra VI and threaten an unnecessary confrontation between the statutory terms of the AEDPA, the Due Process Clause of the Fifth Amendment, and the Suspension Clause of the United States Constitution.

**VIII.    Title 28 U.S.C. § 2244(b)(2) Provides This Court With An Equitable Resolution That Satisfies 28 U.S.C. § 2255 And The Constitution.**

As applied to second or successive §2255 motions, Title 28 U.S.C. §2244 provides in pertinent part that a second or successive motion may be authorized if the facts underlying the claim would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable fact-finder would have found the applicant guilty of the underlying offense. *Id.* §2244(b)(2). It is equally as clear that Mr. Kennedy has conclusively demonstrated that his conviction is not a product of a fair trial and that the material facts and evidence, if not suppressed at his first trial, would have in all probability resulted in a different outcome at his first trial.

This Court has the unfretted discretion to motion the Court of Appeals for the Ninth Circuit to issue a certificate of appealability in this case based upon the facts and evidence before it as well as the sufficiency of evidence supporting the constitutional claims raised.  Such an action would not only be in the equitable interest of justice, but also serve to protect the integrity of the AEDPA and avoid an unnecessary confrontation between the statutory terms of the AEDPA, the Due Process Clause of the Fifth Amendment, and the Suspension Clause of the United States Constitution.  Such consideration would, of course, serve to further present and resolve any jurisdictional issues from arising.

## CONCLUSION

For the foregoing reasons, Mr. Kennedy respectfully requests that his petition be granted by this court either finding that: (a) the remedy provided for under 28 U.S.C. §2255 is inadequate and ineffective in this case and has made a colorable showing to both actual innocence and an unobstructed procedural shot to warrant review of the merits of his claims pursuant to 28 U.S.C. §2241; or

(b) motion the Court of Appeals for the Ninth Circuit in the equitable interest of justice for issuance of a certificate of appealability based upon a sufficiency of material facts and evidence supporting the constitutional claims raised.


Respectfully submitted,

_____

Michael E. Kennedy

Date:  December 31st, 2007.

# EXHIBIT 1

b7c

girl — (girl) — *Good* Blond twin Security
Carol
Rhodes Shaw
Topless Blond

Partly is non-secreter

suspect could lean O secreter ( not a/the
secretor ( out possibly )

Mike Kennedy → O secretor
(is a secretor)
(Given of blood —
Kennedy became
O Secreter)

( ____ ____ ____ )

Or if girl is via secretor

Twin

13% = O%

Secretor most common
Blood Group → 54 to 56%
Population
Secretor 75 to 80% pop.

you can say blood
is non secretor
compatible
↓
Compatible

Michael Kennedy is O
Secretor/Sperm

test tie?
Sperm - non secretor

only thing could be
bulb or say
Rev. 70

2-107

# EXHIBIT 2

ALSO SUBMITTED:

        Two copies of San Diego Police Preliminary
        Examinations on Blood and Semen


Result of examination:

        Grouping tests conducted on the liquid blood
samples disclosed the following:

    K1    "A, Rh $\overline{c}D\overline{e}$, EsD 2-1, EAP B, ADA 1-1,
           AK 1-1 and Hp 2-1."

    K7    "A Rh C$\overline{c}$D$\overline{e}$, PGM 2-1, EsD 1-1, EAP BA,
           ADA 1-1, AK 1-1 and Hp 2-2."

Additional grouping tests conducted on K1 and K7 disclosed
that both MARIA LOPEZ DE FELIX and MICHAEL EDWARD KENNEDY
are nonsecretors.  No serological examinations were conducted
on K8 through K11.

        Group "O" human blood was identified on specimen
Q47.  Blood, too limited in quantity for further characterization,
was identified on specimen Q36.  No blood was found on specimens
Q1 through Q10, Q12 through Q35, Q37 and Q40 through Q46.

        Semen containing spermatozoa, male reproductive
cells, was identified on specimens Q30, Q33, Q43 and Q44.
Grouping tests conducted on the seminal stains identified on
Q30 and Q33 disclosed the absence of any blood group substance.
Additional enzyme grouping tests were inconclusive.  No semen
was found on specimens Q1 through Q29, Q31, Q32, Q34 through
Q37, Q40 through Q42 and Q45 through Q47.

        Three brown head hairs that have been forcibly
removed from the scalp were found in Q11A.  These hairs exhibit
the same microscopic characteristics as hairs present in the
K3 hair sample and, accordingly, could have originated from the
same source as K3.

# EXHIBIT 3

UNITED STATES GOVERNMENT

# Memorandum

UNITED STATES DEPARTMENT OF JUSTICE
FEDERAL BUREAU OF INVESTIGATION

TO : SAC, SAN DIEGO (70-NEW)                    DATE:    11/26/79

FROM : SA ▮▮▮▮▮▮▮

SUBJECT: UNSUB (S);
         ▮▮▮▮▮▮▮▮▮▮▮   MARIA LOPEZ DE FELIX - VICTIM;
         CGR - MURDER
         OO: San Diego

b7C

            ▮▮▮▮▮▮▮, San Diego Police Department,
advised of a rape/murder of an unknown female in the old
Customs Building, 801 East San Ysidro.  The female victim
had been dead approximately eight to nine hours when
▮▮▮▮▮▮▮ contacted the Bureau telephonically at approximately
11:45AM. ▮▮▮▮▮▮▮, San Diego Police Department, will be
in charge of the crime scene until the arrival of Agents.
▮▮▮ may be reached at ▮▮▮▮▮▮▮ and ▮▮▮▮▮▮▮
may be reached at ▮▮▮▮▮▮▮

2 - San Diego
(2)

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 4-18-85 BY 579 btpjahr

70- 7579 - 1

SEARCHED____ INDEXED____
SERIALIZED____ FILED____
NOV 20 1979
FBI-SAN DIEGO

"A"

# EXHIBIT 4

AIRTEL

12/6/79

TO:          DIRECTOR, FBI
             ATTENTION:  FBI LABORATORY

FROM:        SAC, SAN DIEGO (70-7579) (P)

UNSUB;
MARIA LOPEZ DE FELIX -
VICTIM
CGR-MURDER; RAPE (A)
(OO: San Diego)

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 4-16-85 BY SP8 Ittfadr

Re San Diego teletype to the Bureau dated 11/27/79.

Enclosed for FBI Laboratory is one vile of blood
taken from victim at the San Diego County Morgue on 11/26/79.

For information Laboratory, victim's body discovered
behind old Border Station building at Port of Entry, San
Ysidro, California, on 11/26/79 at approximately 10:30 A.M.
Crime scene investigation and preliminary investigation by
the San Diego, California, Police Department Laboratory and
San Diego County Morgue indicates victim was sexually assaulted
and strangled to death sometime during the night of 11/25-26/79.
Crime scene indicates murder and rape took place inside the
building and body subsequently dragged outside through padlocked
door which requires special key.

Investigation on individuals having access to keys
is presently underway and suspects are being developed.

Additional evidence for blood and semen examinations
as well as hair and fibers will be forwarded to the Laboratory
at a later date.

5-Bureau (AM-REGISTERED MAIL, SPECIAL DELIVERY)
   (2-LABORATORY)
   (1-PACKAGE) (REGISTERED MAIL, SPECIAL DELIVERY)
2-San Diego

JLB:vkw
(7)

Sent Reg # 12191
& Special Delivery

70-7579-8
SEARCHED ____ INDEXED ____
SERIALIZED ____ FILED ____

1-14
MK



# EXHIBIT 5



# EXHIBIT 6

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

(HON. HOWARD B. TURRENTINE)

MICHAEL EDWARD KENNEDY,          )   Civil Case No.   85-1204-T
                                 )
              Petitioner,        )   PROOF OF SERVICE
                                 )
v.                               )
                                 )
UNITED STATES OF AMERICA,        )
                                 )
              Defendant.         )
_____ )

I, the undersigned, say:

1.  That I am over eighteen years of age, a resident of the County of San Diego, State of California, and not a party in the within action;

2.  That my business address is 101 West Broadway, Suite 440, San Diego, California, 92101-8297;

3.  That on this date I served the within affidavits of Alex Landon and Juanita R. Brooks in support of petition for writ of habeas corpus on opposing counsel by personally delivering a copy to the United States Attorney's Office, 940 Front Street, Room 5-N-19, San Diego, CA, 92189;

4.  That I mailed additional copies to Petitioner Michael Edward Kennedy c/o Harold I. Glaser, Attorney at Law, Suite 1717, Central Savings Bank Building, 201 N. Charles Street, Baltimore, Maryland, 21201.

I certify under penalty of perjury that the foregoing is true and correct.  Executed on _18_ September 1985, at San Diego, California.

_Teresa E. Hernand_

1  HAROLD I. GLASER
   Attorney at Law
2  Suite 1717, Central Savings Bank Building
   201 N. Charles Street
3  Baltimore, Maryland  21201
   Telephone:  (301) 244-8822

4
   Attorney for Petitioner Michael Edward Kennedy
5

6

7

8                 UNITED STATES DISTRICT COURT

9                SOUTHERN DISTRICT OF CALIFORNIA

10                 (HON. HOWARD B. TURRENTINE)

11  MICHAEL EDWARD KENNEDY,      )  Civil Case No.  85-1204-T
                                 )
12            Petitioner,        )
                                 )
13  v.                           )
                                 )
14  UNITED STATES OF AMERICA,    )
                                 )
15            Defendant.         )
    _____)

16

17                      AFFIDAVITS OF
             ALEX LANDON AND JUANITA R. BROOKS
18               IN SUPPORT OF PETITION
                 FOR WRIT OF HABEAS CORPUS

19

20

21

22

23

24

25

26

27

28

FILED
ENTERED
LODGED
RECEIVED

SEP 18 1985

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

## AFFIDAVIT

STATE OF CALIFORNIA ) 
                           ) ss 
COUNTY OF SAN DIEGO )

    I, Juanita R. Brooks, after having been duly sworn, depose and state:

    1.   In 1980 I was a staff attorney with the Federal Defenders Office in San Diego, California. While with that office I was appointed, along with Alex Landon, to represent Michael Kennedy in the case of United States of America v. Michael Kennedy.

    2.   After being appointed to the case I began to research the physical signs which are used to estimate the time of death. My research led me to the conclusion that the victim in the case had been killed several hours after Petitioner had left the scene. Based on this research, I contacted Dr. Luibel, the pathologist who had performed the autopsy. Dr. Luibel informed me that when he viewed the body at 8:30 a.m. on Tuesday, November 27, 1979 it was his opinion that the death had occurred twenty four (24) to thirty six (36) hours before that time. That opinion would place the time of death between fifteen (15) and twenty seven (27) hours after Petitioner had left the scene. Dr. Luibel later testified at all three trials consistent with this opinion.

    3.   After consulting with Dr. Luibel I consulted with Dr. Noguchi and obtained his services as a defense pathologist.

4.    In all three (3) trials I was the attorney who handled the cross-examination of Dr. Luibel and the direct examination of Dr. Noguchi.  Mr. Coffin, the Assistant United States Attorney, was aware since the initial stages of the case that I, and not Mr. Landon, was the attorney responsible for developing and handling the time of death issue.

5.    Until June of 1982 Mr. Coffin never informed me in any way about his contact with Dr. Burton or the opinion rendered by Dr. Burton.

6.    The cross-examination of Dr. Noguchi by Mr. Coffin involved the use of Dr. Burton's learned treatise.  Had I been made aware of the opinion of Dr. Burton I would have been able to defuse this cross-examination and also use the opinion of Dr. Burton to support the testimony of Dr. Noguchi.  As the Ninth Circuit pointed out in their Opinion, the time of death was a "pivotal issue in the case".

7.    I first learned of Dr. Burton's opinion in a conversation with Mr. Coffin which took place on the train while we were on the way to the Ninth Circuit Court of Appeals for oral argument in this matter.

8.    As soon as I was informed of Dr. Burton's opinion I requested that Mr. Coffin supply a copy of the letter as soon as possible.

///

///

///

-2-

9.    Upon receiving a copy of the letter I took no immediate action because the matter was still on appeal.    I was of the opinion that the matter relating to Dr. Burton's opinion would be appropriately raised as a Motion for New Trial based on newly discovered evidence or a Writ of Habeas Corpus based on the prosecution withholding evidence.    Either action would only be necessary if the appeal were unsuccessful.

10.    The entire appellate process was not completed until early 1984.    At that time, I was informed that new counsel (Harold Glaser) would be taking over the case.    I, therefore, did not file a Motion for New Trial or Petition for Writ of Habeas Corpus.

11.    I was in June of 1982 when I first learned of Dr. Burton's letter, and still am, of the opinion that such information would have greatly assisted the defense case regarding the crucial issue of time of death.

I declare, under the penalty of perjury, that the foregoing is true and correct.

Executed this 18th day of September, 1985, at San Diego, California.

JUANITA R. BROOKS, Affiant

-3-

FILED
ENTERED
LODGED
RECEIVED

SEP 17 1985

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                    DEPUTY

UNITED STATES DISTRICT COURT,

SOUTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,      )      CR.  NO. 82-0102-K
                               )      CIV. NO. 85-1204-T
                               )
        Plaintiff-Respondent,  )
                               )
v.                             )      AFFIDAVIT OF ALEX LANDON
                               )
MICHAEL EDWARD KENNEDY,        )
                               )
        Defendant-Petitioner.  )
_____)

ALEX LANDON, being first duly sworn, deposes and states:

1.  I am an attorney licensed to practice law in the State of California and am admitted into practice in the United States District Court, Southern District of California.

2.  That I have been practicing law since January 5, 1972, and have been a certified specialist in criminal law by the California Board of Legal Specialization since August 11, 1977.

3.  I am currently Executive Director of the Defenders Program of San Diego, Inc. and have been since January of 1982.

4.  That I was one of the defense attorneys for Defendant-Petitioner MICHAEL EDWARD KENNEDY in the above-numbered criminal case.  I was involved in pre-trial preparation, the trial of the case on three separate occasions, and the sentencing proceedings after conviction.

5.  One of the major issues in MICHAEL KENNEDY's case revolved around the time of death of the decedent Maria Lopez. The defense offered evidence from Dr. Thomas Noguchi concerning his belief that the time of death was most likely in the early

1   morning hours of November 26, 1979.  The period of time when Dr.

2   Noguchi believed that the death had occurred was not consistent

3   with the time when MICHAEL KENNEDY would have been present at the

4   Internationl Border area where Maria Lopez' body was found.

5       6.   The government attempted to dispute Dr. Noguchi's

6   testimony and in cross-examining Dr. Noguchi used a statement

7   attributed to a Dr. John Burton.  That was the only time and only

8   context that I heard Assistant United States Attorney Thomas

9   Coffin use Dr. Burton's name.

10      7.   I have read the affidavit of Thomas Coffin and have read

11  that it is his recollection that he verbally told me he had

12  received an opinion from Dr. Burton that the victim had been

13  killed at a time which was after her body had actually been

14  found.  I have no recollection that Mr. Coffin told me anything

15  concerning an opinion by Dr. Burton at any time prior to the

16  sentencing of Mr. KENNEDY.  If Mr. Coffin had told me that Dr.

17  Burton was consulted and gave an opinion, I would have requested

18  a report and would have contacted Dr. Burton.

19      8. The first time I learned that Dr. Burton had been

20  consulted by the U.S. Attorney's Office was when my co-counsel,

21  Juanita Brooks, contacted me after returning from oral argument

22  before the Ninth Circuit on the KENNEDY case.  Ms. Brooks

23  indicated to me that Mr. Coffin had told her on the train ride to

24  Los Angeles about having consulted Dr. Burton.  As far as I know,

25  Mr. Coffin's statement to Ms. Brooks concerning his contact with

26  Dr. Burton was the first time anyone working on the defense of

27  . . .

28  . . .

-2-

MICHAEL KENNEDY's case had knowledge that Dr. Burton had been

contacted by the government.

_____
ALEX LANDON, Declarant

SUBSCRIBED AND SWORN before me this 17th, day of September, 1985.

*Teresa E. Hernandez*

OFFICIAL SEAL
TERESA E. HERNANDEZ
NOTARY PUBLIC · CALIFORNIA
SAN DIEGO COUNTY
My Comm. Expires Feb. 10, 1989

-3-

# EXHIBIT 7

# EXHIBIT 8

# A F F I D A V I T

STATE OF CALIFORNIA   )
                        ) ss.
COUNTY OF SAN DIEGO    )

I, JERRY L. BARNETT, being duly sworn, depose and say:

1.    I am a Special Agent with the Federal Bureau of Investigation and have been since November 23, 1970.

2.    I am currently investigating a violation of federal law involving the rape and murder of MARIA LOPEZ DE FELIX on a government reservation.

3.    On November 26, 1979, at 10:30 a.m., MARIA LOPEZ DE FELIX's partially-clothed body was discovered on the premises of the Old Customs Building , 801 E. San Ysidro Boulevard, San Ysidro, California; these premises are within the special territorial jurisdiction of the United States.

4.    Subsequent examination of the victim's body revealed that she had been raped and that the cause of death was strangulation.

5.    An examination of the crime scene revealed that the rape and murder in all probability occurred within the old Shore Patrol detention facility on the premises:  Dust marks in the room had been disturbed; the victim had gray paint on her legs that was consistent with paint on the floor of the room; a blue tassel off the shawl of the victim was found on the floor of the detention facility; parts of the victim's necklace were found on the floor and in the sink of the room; and the victim's shoes and purse were found in a commode in the detention room.

6.    Investigation by myself and other agents has revealed probable cause to believe that MICHAEL EDWARD KENNEDY was involved in the rape-murder of MARIA LOPEZ DE FELIX in that:

a.    KENNEDY is a Federal Protection Officer and was on duty at the San Ysidro Port of Entry during the early morning hours of November 25, 1979, when MARIA LOPEZ DE FELIX crossed the United States illegally concealed in the trunk of her sister-in-law's automobile; the victim was detained, and then agreed to voluntarily return to Mexico; FPO MICHAEL KENNEDY has admitted that he was one of the last people to see the victim alive on this date, as he escorted her part of the way back towards Mexico and left her with an INS Agent (Charles Clooney) to usher her the rest of the way; INS Agent Clooney has stated that he took the victim to the entrance of the Immigration Building, and released her, pointing her towards Mexico; the walkway over which the victim was to have traversed to get back into Mexico passes by the old Customs Building, and INS Agent Clooney indicated he did not watch the victim as she traversed this walkway after he released her and pointed her towards Mexico; Clooney also indicated that he did not see where KENNEDY went after the latter turned DE FELIX over to him.

b.  As pointed out above, the old Customs Building is located adjacent to the walkway over which the victim would have traveled on her way back to Mexico; several outer gates separate the building from the walkway (these outer gates, however, are not formidible and can be rather easily opened; the last outer gate had been taped shut, but had been cut on the evening of the murder with a sharp instrument -- pieces of this tape were found inside the detention room that was the scene of the rape-murder); the building itself was secured by a door locked by a padlock (this lock, however, could be opened by a master key).

c.  My investigation has revealed that on November 25, 1979, FPO KENNEDY had possession of the master key that would have negotiated the lock to the old Customs Building and has admitted being in that room on prior occasions.

d.  Examination of the detention room in the old Customs Building where the murder took place revealed two Kool cigarette butts on the floor and one in the sink (beneath parts of the victim's necklace); my investigation revealed that MICHAEL KENNEDY smokes Kool cigarettes, of the same type found in the detention room.

e.  After the victim disappeared and prior to her body being discovered, KENNEDY injured his right hand (index finger); and interview of his physician revealed that KENNEDY cut his finger with a knife, and the wound required eight stiches to close; as mentioned previously, one of the outer gates to the Old Customs Building had been taped shut and this tape had been cut with a sharp instrument (such as a knife) on the date of the murder.

f.  FPO KENNEDY has given an inconsistent explanation to a co-worker regarding the injury suffered to his hand on the date MARIA LOPEZ DE FELIX was raped and murdered.  He told one co-worker that he injured his hand screwing in a loose hasp to the FPO guard shack (examination of this shack by FBI Agent Jim Bird, however, revealed that there are no screws on this hasp, but rather the hasp is riveted in place); furthermore, the doctor who treated KENNEDY for the wound has stated the wound was made by a knife.

g.  FPO KENNEDY is also considered a suspect in another murder of a young Mexican female, this one occurring on February 12, 1979; on this occasion, the victim was found in a shallow grave in the Jamul, California, area, and had been sexually molested and strangled.  Investigation revealed that FPO KENNEDY knew this victim and had called her house on the date she disappeared.

7.     I have probable cause to believe that the premises of 160 JAMUL AVENUE in CHULA VISTA, CALIFORNIA, contain evidence of the above-described crime in that:

a.   My investigation has revealed that FPO KENNEDY resides on these premises, and did so on the date of the murder.

b.   KENNEDY's co-workers indicate that he takes his uniform home with him after work, and that he was wearing an FPO uniform on the date the victim was murdered.  Examination of this uniform may reveal: the presence of the victim's blood (she was beaten during the course of her rape and murder, and she had slight abrasions on the inside of her mouth); the presence of the victim's hair follicles; the presence of gray paint (similar to that found on the victim.

c.   The victim's sister-in-law has stated that the victim wore gold earrings with a diamond appearing stone attached on a gold chain, and a gold wire bracelet on the date she was murdered; these items of jewelry were not found at the murder scene; in my nine years of experience as an FBI agent I have been informed by fellow agents of numerous cases in which perpetrators of violent crimes have stolen valuables belonging to their victims and kept them at their residences for either sale or as keepsakes; because this murder occurred approximately 7 days ago, I have probable cause to believe that such jewelry may still be in the possession of MICHAEL E. KENNEDY.

JERRY L. BARNETT
SPECIAL AGENT

SUBSCRIBED and SWORN to before me this ___3rd___ day of __December__ 19 _79_ .

U. S. MAGISTRATE

-3-

# EXHIBIT 9

Form A. O. 91 (Rev. Apr. 1931)

# United States District Court

## FOR THE

### SOUTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA

vs.

THE PREMISES AT
160 JAMUL AVENUE
CHULA VISTA, CALIFORNIA

Docket No. 79

Case No. 2919M

**SEARCH WARRANT**

To  Any Authorized Federal Officer or Agent of the Federal Bureau of
     Investigation

Affidavit(s) having been made before me by    Jerry L. Barnett

that he has reason to believe that { ~~the person or~~ on the premises known as }

160 JAMUL AVENUE
CHULA VISTA, CALIFORNIA

in the Southern        District of  California

there is now being concealed certain property, namely (1) a gold wire bracklet belonging
to Maria Lopez de Felix; (2) two gold earrings (pierced type) with small
gold chains to which diamond-appearing stones are attached, also belonging
to Maria Lopez de Felex; (3) clothing worn by Michael Edward Kennedy on
the date when Maria Lopez de Felix was raped and murdered, including a
Federal Protection Officer uniform worn on the dates of 11/25/79 and
11/26/79; (4) fibers from the hair of Maria Lopez de Felix; (5) human
blood particles from Maria Lopez de Felix, which items are the
fruits, instrumentalities and evidence of the crimes of rape and
murder on a government reservation.

and as I am satisfied that there is probable cause to believe that the property so described is being
concealed on the person or premises above described and that grounds for application for issuance of the
search warrant exist as stated in the supporting affidavit(s).

You are hereby *commanded* to search within a period of *ten (10)*
(not to exceed 10 days) the person or place named for the property specified, serving this warrant
and making the search { in the daytime (6:00 a.m. to 10:00 p.m.) ~~at any time in the day or night~~ } and if the property be found
there to seize it, leaving a copy of this warrant and receipt for the property taken, and prepare a written
inventory of the property seized and promptly return this warrant and bring the property before
-- ---------------------------- as required by law.
     *Federal Judge or magistrate*

APPENDIX A

Dated this  3  day of  *December* 19 79
4:32 pm

*Judge (Federal or State Court of Record or Federal Magistrate)*  (SEAL)

## RETURN

I received the attached search warrant                    , 19    , and have executed it as follows:

On            , 19    at        o'clock      M, I searched the person or premises described in the warrant and

I left a copy of the warrant with _____
                                  name of person searched or owner or "at the place of search"

together with a receipt for the items seized.

The following is an inventory of property taken pursuant to the warrant:

This inventory was made in the presence of

                              and

I swear that this Inventory is a true and detailed account of all the property taken by me on the warrant.

_____

Subscribed and sworn to and returned before me this            day of        , 19   .

_____
                                   Federal Magistrate

# EXHIBIT 10

FD-340 REV. (6-14-77)

6 pgs. - envelope & content

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 5-2-85 BY SPB lljfah

(34)

Field File No. 70-75791A

OO and File No. _____

Date Received 12/3/79

From _____

(NAME OF CONTRIBUTOR)

_____

(ADDRESS OF CONTRIBUTOR)

_____

(CITY AND STATE)

By _____

(NAME OF SPECIAL AGENT)

To Be Returned  ☐ Yes      Receipt Given  ☐ Yes
                ☑ No                       ☑ No

Description:

Search warrant
for residence of
Michael Kennedy

not Executed

Returned on 12/12/79

(34)

3-2

# EXHIBIT 11

FD-340a (Rev. 10-3-77)

UNSUB; MARIA LOPEZ DE FELIX
(Title) VICTIM, CGR-MURDER; RAPE

(File No.) -70-7579

| Item | Date Filed | To be returned Yes No | | | Disposition |
|---|---|---|---|---|---|
| 1A 34 | 12/12/79 | | SEARCH WARRANT FOR RESIDENCE OF MICHAEL | | |
| | | | KENNEDY NOT EXECUTED RETURNED ON 12/12/79 | | |
| 1A 35 | 12/12/79 | | AGENTS NOTES 1 ARRIVING AT SCENE 2 ▮▮▮ | | b7C |
| | | | ▮▮▮▮▮▮▮▮▮▮ | | b7D |
| 1A 36 | 12/12/79 | | AGENT NOTES INTERVIEW OF ▮▮▮▮▮ | | |
| | | | ▮▮▮▮▮▮▮▮▮▮▮ | | |
| 1A 37 | 12/12/79 | | ONE USED ROLL OF WHITE TOILET PAPER- | | |
| | | | RECOVERED FROM CELL BLOCK OF OLD SHORE PATROL | sent to lab 12 11/79 | |
| 1A 38 | 12/12/79 | | PHOTOGRAPHS OF TAPED GATE NEAR CRIME | sent to lab 12/11/79 | |
| | | | SCENE | | |
| 1A 39 | 12/12/79 | | 7 5 x 8 INDEX CARDS BEARING LATENT FINGER- | | |
| | | | PRINT LIFTS FROM CRIME SCENE OLD SHORE | | |
| | | | PATROL DETENTION CENTER | | |
| 1A 40 | 12/12/79 | | HAIR SAMPLES FROM MICHAEL EDWARD KENNEDY | sent to lab 12/7/7 | |
| | | | (HEAD, MUSTACHE & CHEST) | | |
| 1A 41 | 12/12/79 | | COLOR PHOTOS OF VICTIM AT CRIME SCENE | sent to lab 12/7/79 | |
| | | | AND MORGUE | | |

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 6-2-85 BY ▮▮▮▮▮▮▮

DO NOT DESTROY—
FOI/PA REQUEST
RECEIVED ▮▮▮▮▮▮▮

70-7579 1A
SERIALIZED     INDEXED
SERIALIZED     FILED
DEC 11 07
FBI SAN DIEGO

# EXHIBIT 12

Michael E. Kennedy
#35377-098
Low Security Correctional
Institution
P.O. Box 0999
Unit: Vance - A
Butner, NC 27509

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,    )    CRIM. No. 80-0102-K
                             )    CIVIL No. 97-0776-K
              Respondent,    )
                             )
        vs.                  )
                             )
MICHAEL EDWARD KENNEDY,      )    AFFIDAVIT 1-A IN SUPPORT
                             )    OF PETITIONER'S TRAVERSE
              Petitioner.    )

State of Maryland      )
County of Wicomico     )              ss:


MARILYN LOUISE KENNEDY, being duly sworn, deposes and says:

1. I am the mother of the Petitioner in the above entitled matter.  I make this affidavit to the events relating to the search of my home on the evening of 3 December, 1979, by Special Agents of the Federal Bureau of Investigation.

2. On December 3, 1979, I was the legal owner of a private residence located at 160 Jamul Avenue, Chula Vista, California.

3. On December 3, 1979, I was residing at the foregoing private residence located at 160 Jamul Avenue, Chula Vista, California.

4. On December 3, 1979, the Petitioner resided at the private residence located at 160 Jamul Avenue, Chula Vista, California.

5. On the afternoon of December 3, 1979, the Petitioner was taken to the downtown office of the Federal Bureau of

Investigation, located in the San Diego federal office building, by Kenneth A. Vardell and James M. Bird, both Special Agents of the Federal Bureau of Investigation, for questioning.

6. Approximately 5 hours later, on the evening of December 3, 1979, Petitioner was returned home by Special Agents Vardell and Bird.

7. Special Agents Vardell, Bird, and Jerry L. Barnett, another Special Agent of the Federal Bureau of Investigation, entered my home on the evening of December 3, 1979, with the Petitioner.

8. Upon entering my house on the evening of December 3, 1979, Special Agents Vardell and Barnett announced to me that they were in possession of a search warrant for my home.

9. Special Agents Vardell and Barnett further stated that Petitioner had given his consent to the search of our house.

10. Petitioner then informed me that Special Agents Vardell and Barnett had asserted to him that they were in possession of a search warrant for the house.

11. Special Agents Vardell and Barnett thereafter requested my consent to their search of my home.

12. I believed that I had no legal right to object or resist the search and gave my consent based on Special Agent Vardell's and Barnett's claim that they possessed a search warrant for my home.

13. The house was then searched by Special Agents Vardell, Bird, and Barnett.

14. A number of the Petitioner's personal items were seized

by Special Agents Vardell, Bird, and Barnett during the course
of the search of my home.

15.   The personal items seized by Special Agents Vardell, Bird,
and Barnett during their search were subsequently used against
the Petitioner throughout his three trials.


Dated: _June 25_ , 1997.   _Marilyn Louise Kennedy_
                             Marilyn Louise Kennedy
                             Affiant



Sworn to before me this 25th day of _June_ , 1997.

_Charles D. Armentino_
Notary Public

My Commission Expires _August 1_ , _1999_ .

# EXHIBIT 13

Michael E. Kennedy
#35377-098
Low Security Correctional
Institution
P.O. Box 0999
Unit: Vance - A
Butner, NC 27509

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CRIM. No. 80-0102-K |
| | ) | CIVIL No. 97-0776-K |
| Respondent, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| MICHAEL EDWARD KENNEDY, | ) | AFFIDAVIT 1-B IN SUPPORT |
| | ) | OF PETITIONER"S TRAVERSE |
| Petitioner. | ) | |

State of Maryland    )
County of Wicomico   )              ss:

MICHAEL PAUL KENNEDY, being duly sworn, deposes and says:

1.  I am the step-father of the Petitioner in the above entitled matter. I make this affidavit to the events relating to the search of my home on the evening of 3 December, 1979, by Special Agents of the Federal Bureau of Investigation.

2.  On December 3, 1979, I was the legal owner of a private residence located at 160 Jamul Avenue, Chula Vista, California.

3.  On December 3, 1979, I was residing at the foregoing private residence located at 160 Jamul Avenue, Chula Vista, California.

4.  On December 3, 1979, the Petitioner resided at the private residence located at 160 Jamul Avenue, Chula Vista, California.

5.  On the afternoon of December 3, 1979, the Petitioner

was taken to the downtown office of the Federal Bureau of Investigation, located in the San Diego federal office building, by Kenneth A. Vardell and James M. Bird, both Special Agents of the Federal Bureau of Investigation, for questioning.

6. Approximately 5 hours later, on the evening of December 3, 1979, Petitioner was returned home by Special Agents Bird and Vardell.

7. Special Agents Vardell, Bird, and Jerry L. Barnett, another Special Agent of the Federal Bureau of Investigation, entered my home on the evening of December 3, 1979, with the Petitioner.

8. Upon entering my house on the evening of December 3, 1979, Special Agents Vardell and Barnett announced to me that they were in possession of a search warrant for my home.

9. Special Agents Vardell and Barnett further stated that Petitioner had given his consent to the search of our house.

10. Petitioner then informed me that Special Agents Vardell and Barnett had asserted to him that they were in possession of a search warrant for the house.

11. Special Agents Vardell and Barnett thereafter requested my consent to their search of my home.

12. I believed that I had no legal right to object or resist the search and gave my consent based on Special Agent Vardell's and Barnett's claim that they possessed a search warrant for my home.

13. The house was then searched by Special Agents Vardell, Bird, and Barnett.

14.    A number of the Petitioner's personal items were seized by Special Agents Vardell, Bird, and Barnett during the course of the search of my home.

15.    The personal items seized by Special Agents Vardell, Bird, and Barnett during their search were subsequently used against the Petitioner throughout his three trials.


Dated: June 25, 1997.    Michael Paul Kennedy
                         Michael Paul Kennedy
                         Affiant


Sworn to before me this 25th day of June, 1997.

Notary Public

My Commission Expires August 1, 1999.

# EXHIBIT 14

1  Michael E. Kennedy
   #35377-098
2  Low Security Correctional
   Institution
3  P.O. Box 0999
   Unit: Vance - A
4  Butner, NC., 27509

5              UNITED STATES DISTRICT COURT

6             SOUTHERN DISTRICT OF CALIFORNIA

7  UNITED STATES OF AMERICA,  )    CRIM NO.  80-0102-K
                              )    CIVIL NO. 97-0776-K
8                Respondent,  )
                              )
9        v.                   )
                              )
10 MICHAEL EDWARD KENNEDY,     )    AFFIDAVIT IN SUPPORT OF
                              )    PETITIONER'S TRAVERSE
11               Petitioner.  )

12 State of North Carolina    )    ss:
   County of Granville        )
13

14 MICHAEL EDWARD KENNEDY, being duly sworn, deposes and says:

15   1.  I am the Petitioner in the above entitled matter.  I make

16 this affidavit in support of my traverse to the government's

17 response.

18   2.  The petition in this matter asserts claims of suppression

19 of evidence in violation of Brady v. Maryland; prosecutorial

20 misconduct; denial of effective assistance; and unconstitutional

21 search and seizure.

22   3.  On information and belief, the District Court is only

23 addressing those claims based on new grounds or information not

24 previously raised or decided.

25   4.  The Government did not initially begin to supply the infor-

26 mation relevant to this petition until 2 days prior to oral

27 arguments on Petitioner's first section 2255 before the Court of

28                          - 1 -              97CV0776/8CCR0102

1  Appeals on 3 August, 1988.

2     5.  The Government's release of information relevant to this

3  petition has spanned over the course of several years beginning

4  in August of 1988.

5     6.  The Government is still in possession of numerous documents

6  relevant to this petition, to include 5 sixty minute cassette

7  tapes, held to be exempt by the Federal Bureau of Investigation

8  under the provisions of the FOIA/PA from the Petitioner.

9     7.  Without compelling full and complete discovery by the

10  Respondents, Petitioner cannot state the degree of materiality

11  of the documents and cassette tapes withheld under the provisions

12  of the FOIA/PA.

13     8.  The Government's suppression of evidence denied Petitioner

14  due process by restricting the wide latitude required by trial

15  counsel to make tactical and strategic decisions in the prepar-

16  ion and presentation of his case.

17     9.  The Government's suppression of evidence denied Petitioner

18  due process by preventing defense challenge of the constitutional-

19  ity of search warrants obtained through perjury and subsequent

20  evidence seized from his home and car.

21     10.  The Government's suppression of evidence denied Petitioner

22  due process by preventing defense from raising serious doubts

23  and challenge to the actual validity of the clothing seized during

24  the course of a search of his home.

25     11.  The Government's suppression of evidence denied Petitioner

26  due process by preventing the defense from subpoenaing witnesses

27  present at the crime scene whose testimony may have been extremely

28                              - 2 -                  97CV0776/8CCRC102

favorable to the defense.

12. The Government's suppression of evidence denied Petitioner due process by restricting trial counsel's investigative ability to develope other mitigating evidence to further substantiate his line of defense.

13. The Government's suppression of evidence denied Petitioner due process by forcing trial counsel curtailment of cross-examination and direct-examination of government witnesses.

14. The Government's suppression of evidence denied Petitioner due process by concealing the known perjury and subsequent impeachment of government witness Jerry L. Barnett, a Special Agent of the Federal Bureau of Investigation.

15. The Government's suppression of evidence denied Petitioner due process by serving to constructively restrict and reduce the impeachment effect upon government witness Kenneth A. Vardell, a Special Agent of the Federal Bureau of Investigation.

16. The Government's suppression of evidence denied Petitioner due process by serving to constructively restrict and reduce the impeachment effect upon government witness James M. Bird, a Special Agent of the Federal Bureau of Investigation.

17. The Government's suppression of evidence denied Petitioner due process by serving to constructively restrict and reduce the impeachment effect upon government witness Francis Luibel, M.D., the examining pathologist, as it applied to time-of-death testimony.

18. The Government's suppression of evidence denied Petitioner due process by serving to constructively restrict and reduce the impeachment effect upon the government's toxicologist witness.

- 3 -                    97CV0776/80CR0102

19.   The Government's suppression of evidence denied Petitioner due process by serving to constructively restrict the defense from raising additional serious doubts and challenge to the laboratory analysis of the government's evidence.

20.   The Government's suppression of evidence denied Petitioner due process by depriving him of the right to put the prosecution to its lawful proof.

21.   The Government's suppression of evidence denied Petitioner due process by constructively depriving the defense challenge to denial of an opportunity for equal consideration to bail.

22.   Subsequent to February, 1997, Petitioner had no prior knowledge of the information contained in the search warrant affidavits for his home and car.

23.   On information and belief, the search warrants and search warrant affidavits for Petitioner's home and car were not contained in the case files released to appellate counsel.

24.   Subsequent to February, 1997, Petitioner had no prior knowledge of trial counsel's having filed an effectiveness of assistance motion pursuant to Federal Rule of Criminal Procedure 33.

25.   On information and belief, trial counsel's Rule 33 effectiveness of assistance motion was not contained in the case files released to appellate counsel.

26.   Petitioner submitted a request for certificate of appeal when filing his section 2255 petition with the United States District Court for the Southern District of California which is now pending.

97CV0776/80CR0102

27.  Petitioner submitted a motion for certification of appeal and an amendment to mandate to the United States Court of Appeals for the Ninth Circut, which was assigned Court of Appeals case No. 97-80109.

28.  Petitioner submitted a motion for modification of sentence, pursuant to Federal Rule of Criminal Procedure 35 and Federal Rule of Civil Procedure 60(b), with the United States District Court for the Southern District of California.

29.  Petitioner did not submit the motion for modification of sentence pursuant to Title 28 United States Code Section 2255.

30.  Petitioner did not assert in his motion for modification of sentence a claim of denial or infringement of constitutional rights.

31.  On 3 December, 1979, Petitioner was legally residing at the private residence of his parents, located at 160 Jamul Avenue, Chula Vista, California.

32.  On 3 December, 1979, Petitioner was questioned by Kenneth A. Vardell and James M. Bird, Special Agents of the Federal Bureau of Investigation, for a period of 5 hours.

33.  Petitioner's questioning by Special Agents Vardell and Bird on 3 December, 1979, was conducted in an interview room within the offices of the Federal Bureau of Investigation located in the downtown San Diego federal office building.

34.  At the conclusion of Petitioner's interview on 3 December, 1979, Petitioner was informed by Special Agent Vardell and Jerry L. Barnett, another Special Agent of the Federal Bureau of Investigation, that they were in possession of a search warrant

- 5 -          97CV0776/80CR0102

1  for Petitioner's home.

2  35.  Special Agents Vardell and Barnett then stated to the

3  Petitioner in the presence of Agent Bird, that while they had

4  a search warrant, it would "look better" if Petitioner gave

5  consent to the search of his home.

6  36.  Petitioner, in the face of Special Agent Vardell's and

7  Barnett's assertion of possession of a search warrant, gave

8  consent to the search of his home in the belief that he had no

9  legal right to resist the search.

10  37.  Following a search of his personal locker at work on the

11  evening of 3 December, 1979, Petitioner was transported back to

12  his home by Special Agents Vardell and Bird.

13  38.  Upon entering his home, Special Agents Vardell and Barnett,

14  accompanied by Agent Bird, announced to Petitioner's parents that

15  they were in possession of a search warrant for the home.

16  39.  Special Agents Vardell and Barnett then asserted to the

17  Petitioner's parents that Petitioner had given his consent to the

18  search of the home.

19  40.  Petitioner informed his parents that Special Agents Vardell

20  and Barnett had, indeed, asserted possession of a search warrant

21  for the home.

22  41.  Petitioner's parents gave their consent to the search of

23  the home on the assertions of a search warrant made by Special

24  Agent Vardell and Barnett, and upon their request for consent.

25  42.  Petitioner's home was thereafter searched by Special Agents

26  Vardell, Barnett, and Bird.

27  43.  Numerous items of Petitioner's personal property were seized

28                    - 6 -      97CV0776/80CR0102

1  by Special Agents Vardell, Barnett and Bird during the search

2  of his home on the evening of 3 December, 1979.

3    44.  The numerous items of Petitioner's personal property

4  seized during the search of his home on the evening of 3

5  December, 1979, were used as evidence against him throughout

6  the course of his three trials.

8  Dated: _June 19th_, 1997.

                                   _____
9                                  Michael Edward Kennedy
10                                 Petitioner, Pro se

18  Sworn to before me this _19th_ day of _June_, 19_97_.

20  _____
    Notary Public

22  My Commission expires _____, _____.

**"OFFICIAL SEAL"**
Notary Public, North Carolina
County of Wake
Nancy A. Villanueva
My Commission Expires 3/18/2002

- 7 -                       97CV0776/30CR0102

# EXHIBIT 15

1    MR. COFFIN:   No further questions.

2    THE COURT:   Mr. Landon.

3    MR. LANDON:   Thank you, your Honor.

4

5                    CROSS-EXAMINATION

6    BY MR. LANDON:

7    Q.    Mr. Barnett, you referred to a date when you actually

8    went to Mr. Kennedy's residence and conducted a search, is

9    that correct?

10   A.    Yes, sir, I believe it was December the 3rd.

11   Q.    All right.  And at that time was Mr. Kennedy there?

12   A.    Yes, he was.

13   Q.    Was his mother there?

14   A.    Yes, she was.

15   Q.    Was his father there?

16   A.    Yes, his stepfather.

17   Q.    And were there any other members of the family there?

18   A.    There was an older man there, I'm not sure, I believe

19   it was a grandparent, and his, I believe one of his younger

20   brothers was there.

21   Q.    And at the time that you searched the residence, did

22   you have Mr. Kennedy's permission to search the residence?

23   A.    Yes, sir, we did.

24   Q.    And were Mr. Kennedy and his parents cooperative

25   with you in allowing the search of the residence?

1    A.    Very cooperative.

2    Q.    And at some point in time, my understanding is that

3 you came into possession of a jacket and a pair of shoes, is

4 that correct?

5    A.    Yes, sir, that's correct.

6    Q.    And where did you get those from?

7    A.    Agent Vardell handed them to me.

8    Q.    Where did you put them?

9    A.    I placed them on the bed, which was in a bedroom.

10 I believe it was one of Kennedy's brother's bedrooms, where

11 he had been sleeping.

12    Q.    And how did you place them on the bed?

13    A.    As I recall I just set them down like they were

14 handed to me, because I had to make out a receipt for the

15 items that I was receiving.

16    Q.    How were they handed to you?

17    A.    Agent Vardell handed them to me, I don't recall

18 exactly how he handed them to me.

19    Q.    The shoes were sitting on top of the jacket?

20    A.    They were touching the jacket.  I'm not sure if they

21 were on top or not.

22    Q.    And when you placed them on the bed, were the shoes

23 sitting on top of the jacket?

24    A.    I believe they were.

25    Q.    Now, at some point in time you put them, the shoes

# EXHIBIT 16

1      A    YES.

2      Q    OVER THIS FIVE-HOUR PERIOD?

3      A    YES.

4      Q    AS FAR AS YOUR REPORTS OR YOUR NOTES REFLECT, THE
5  ONLY COMMENT YOU MAKE IN REGARDS TO THAT IS THAT KENNEDY
6  DENIED HE HAD ANYTHING TO DO WITH THE RAPE AND MURDER OF
7  MARIA LOPEZ DE FELIX?

8      A    YES.  THAT WOULD BE THE SUBSTANCE OF HIS COMMENT,
9  NOT A QUOTATION.

10     Q    THERE IS NO OTHER REFERENCE IN YOUR NOTES OR YOUR
11 REPORT?

12     A    NO.

13     Q    NOW, TOWARD THE END OF THE INTERROGATION DID YOU
14 ASK MICHAEL KENNEDY IF YOU COULD SEARCH HIS HOME?

15     A    YES.

16     Q    NOW, AT THIS POINT, YOU HAD BEEN QUESTIONING HIM
17 FOR SOME FIVE HOURS?

18     A    YES.

19     Q    AND YOU HAD ACTUALLY ACCUSED HIM OF COMMITTING THE
20 MURDER OF MARIA LOPEZ?

21     A    YES.

22     Q    AND YOU THEN ASKED IF YOU COULD SEARCH HIS HOME?

23     A    YES.

24     Q    AND HE TOLD YOU THAT YOU COULD?

25     A    YES.

# EXHIBIT 17

b7C

12/3/79    Consent Search of Kennedy    159
Residence

| 12/3/79 | Consent Search 302 - Log | #189 |
| 12/7/79 | Kennedy arrest as material witness | 90 |
| 1/31/80 | Michael Kennedy arrest 302 | 182 |
| 12/3/79 | Michael E. Kennedy interview in office | 125 |

2-294



# EXHIBIT 18



U.S. Department of Justice

**United States Attorney**
**Southern District of California**

United States Courthouse
940 Front Street, Room S-N 19
San Diego, California 92189

714/293-5610

December 16, 1980

Honorable William H. Webster
Director, Federal Bureau of Investigation
Room 7176, J. Edgar Hoover Building
9th & Pennsylvania Avenue, N.W.
Washington, D.C.  20530

Dear Mr. Webster:

I wish to commend, in the strongest possible terms, the Federal
Bureau of Investigation in general and several agents in partic-
ular for the successful investigation and prosecution of a recent
rape-homicide case in our district.

The case was one of extreme importance to the community: the
defendant, Michael E. Kennedy, was a Federal Protective Officer;
his victim, Maria Lopez de Felix, was a Mexican National whom
the defendant had encountered while on duty and in uniform at the
border.  The crime was both shocking and senseless, in that this
19-year old girl was killed during a sexual assault by a United
States officer who had an affirmative duty to protect her.

Moreover, the case was of the utmost difficulty, and its solution
displayed the best in both the FBI field office here in San Diego
and the FBI Laboratory in Washington, D.C.  To begin with, there
were no witnesses to the crime.  The offense was solved because
of a combination of meticulous field work, in which evidence was
carefully collected at the crime scene and from the defendant's
residence, pursuant to a warrant and sent to the lab for analysis.
There, experts thoroughly examined thousands of evidentiary items
and linked the defendant to Maria Lopez' rape-homicide through hair
strand comparisons, microscopic paint comparisons, semen and blood
analyses, and fingerprint identifications.  In addition, the special
projects sections of the lab constructed a scale-model of the prem-
ises where the rape and murder took place, which was of great
assistance during the trial.

I-316

Honorable William H. Webster
Re: United States v. Michael Kennedy
December 16, 1980
Page Two

Kennedy was convicted of both rape and first-degree murder on
December 15, 1980, and is scheduled for sentencing on January 12,
1981. I am sure I speak for the entire community of San Diego
when I say "thank you" for a job expertly done. In particular,
I wish to bring the following agents and personnel to your
attention for their roles in this critical prosecution:

Special Agent James Bird, Case Agent, San Diego Field Office

Special Agent Jerry Barnett, San Diego Field Office

Special Agent Kenneth Vardell, San Diego Field Office

Special Agent Roy Tubergen, FBI Laboratory, Washington, D.C.

Special Agent Robert Webb, FBI Laboratory, Washington, D.C.

Special Agent Robert Neill, FBI Laboratory, Washington, D.C.

Special Agent Fred Wallace, FBI Laboratory, Washington, D.C.

Special Agent ████████████ FBI Laboratory, Washington, D.C.    b7c

Elman Robinson, Fingerprint Specialist, Washington, D.C.

Sincerely yours,

M. JAMES LORENZ
United States Attorney

cc:   Mr. Norman A. Zigrossi
      Special Agent in Charge
      Federal Bureau of Investigation
      880 Front Street, Suite 6-S-31
      San Diego, California 92188

I-317

# PROOF OF SERVICE

# PROOF OF SERVICE BY MAIL

(Fed R. Civ. P.5; 28 U.S.C. §1746)

I, <u>Michael Edward Kennedy</u>, declare:

I am over 18 years of age and a party to this action. I am a resident of Salisbury, Maryland, in the county of Wicomico. My address is: 33250 Old Ocean City Road, Salisbury, Maryland 21849. On December 31st, 2007, I served the attached petitioner's traverse to the government's response and an affidavit in support of petitioner's traverse to the government's response on the parties herein by placing true and correct copies thereof, enclosed in a sealed envelope, with postage prepaid, in the United States mail in a deposit box so provided by the United States Postal Service in the above-named city where I am presently located. The envelope was addressed as follows:

> United States Attorney for the
> Southern District of California
> Appellate Division
> 880 Front Street, Room 6293
> San Diego, California 92101-8893

Pursuant to 28 U.S.C. §1746, I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on this 31st day of December, 2007.

> Michael E. Kennedy
> Petitioner, Pro se

> Michael E. Kennedy
> 33250 Old Ocean City Road
> Salisbury, Maryland 21849
> (410) 572-8802

Civ-69 (Rev. 9/97)

::ODMA\PCDOCS\WORDPERFECT\22832\1

- 26 -